### 12110. SOUTHERN FLOUR & GRAIN COMPANY *v.* CENTRAL TEXAS EXCHANGE NATIONAL BANK.

1. Where a purchaser orders from a seller grain which is consigned by the seller to himself, with a memorandum on the bill of lading to notify the purchaser, and contemporaneously the seller draws a draft on the purchaser for the price of the grain, payable to a bank, to which is attached the bill of lading, indorsed by the seller, or in blank, and deposits with the bank the draft with bill of lading attached, and the amount of the deposit is credited to the depositor's general account, the bank becomes the purchaser of the draft with bill of lading attached, and the owner of the grain represented thereby.

2. Where, in the case above stated, the bank presents the draft, with the bill of lading, to the purchaser of the grain and demands payment, and the purchaser refuses to pay the draft, or to deliver the grain on demand, the bank has the right to bring an action of trover against the purchaser and to demand a verdict for the amount of the draft, with seven per cent. interest, where the amount is not more than the highest proved value of the grain between the date of the conversion and the trial. *O'Neill Mfg. Co.* v. *Woodley,* 118 *Ga.* 116; *Milltown Lumber Co.* v. *Carter,* 5 *Ga. App.* 353.

3. There was no error in directing a verdict for the plaintiff for the amount of the draft, with seven per cent. interest, this being less than the highest proved value of the grain, which the plaintiff had elected to take, and which the evidence, with all reasonable inferences and deductions therefrom, proved was its legal right.

DECIDED NOVEMBER 1, 1921. REHEARING DENIED NOVEMBER 18, 1921.

Trover; from city court of Atlanta — Judge Reid. November 1, 1920.

The Central Texas Exchange National Bank brought an action of trover against the Southern Flour & Grain Company for two carloads of oats. At the appearance term the defendant filed a general denial. At the beginning of the trial it filed two amend-

ments, setting up in substance the following defenses: The defendant had purchased from the firm of McKie & Tilton, in Waco, Texas, a number of carloads of oats, to be shipped to Atlanta, Ga. These oats were shipped by the firm in Texas under bills of lading with attached drafts on the defendant, drawn by the firm and payable to the plaintiff bank. It was claimed by the defendant that a number of these carloads did not come up to the grade contracted for, and thereupon the defendant and the sellers of the oats began negotiations for the purpose of adjusting the contracts between them as to the grades of the oats, including the two carloads involved in the present suit. When these carloads arrived in Atlanta they were graded "hot, musty, and wet." Thereupon the defendant wired to McKie & Tilton, informing them of the defective condition of these two carloads, the telegram containing the following: "Instruct bank to release lading. Will store in order to save ruining." The drafts and bills of lading covering these two cars were in the hands of the Third National Bank of Atlanta, having been forwarded by the plaintiff bank for collection. On receipt of this telegram from the defendant, McKie, of McKie & Tilton, went to the plaintiff bank in Waco and exhibited the telegram requesting the bank for a release of the bills of lading, in order that the cars might be stored, and asked that it be complied with. Thereupon the plaintiff bank telegraphed the Third National Bank, authorizing it to surrender to the defendant the bills of lading covering the two cars involved in the suit. It is further alleged by the grain company, as a matter of defense, that at this time there were also seven cars of oats in Atlanta against which drafts on the grain company and bills of lading were held for collection by the Third National Bank, and against which the grain company held various claims arising out of off-grades of the oats purchased from McKie & Tilton. At this time McKie, of the firm of McKie & Tilton, went to Atlanta for the purpose of adjusting the differences, and had an interview with the president of the grain company. As a result of this interview McKie agreed with the grain company that if it would pay the drafts against the seven other cars the grain company might hold the two cars involved in this suit, which had been released for storage, as a margin to cover deductions justified by off-grades in the seven cars paid for; and the defendant alleged that the off-

grades of the seven cars totaled $840.06, which in the present suit is set up by the grain company as a counterclaim against the claim of the plaintiff bank.

The grain company alleges also as a matter of defense that it had no notice, and did not know until after it had paid the drafts covering the seven cars, that the bills of lading covering the two cars in suit belonged to the plaintiff bank. It further alleges that the plaintiff bank authorized McKie, of the firm of McKie & Tilton, to come to Atlanta for the purpose of adjusting the differences alleged, and that any arrangement or adjustment made by McKie with the grain company in Atlanta was made when he was acting as the agent of the plaintiff bank, and for this reason the bank was bound by McKie's agreement with the grain company that the two cars in suit should be left with the defendant to indemnify it for any differences in the grades of the oats.

The undisputed evidence showed that drafts covering the cars in question were drawn on the defendant grain company by McKie & Tilton, payable to the plaintiff bank, which drafts the plaintiff bank bought, paying the full amount therefor and crediting it to the account of McKie & Tilton, the bills of lading representing the oats being attached to the drafts, thereby putting the title to the oats in the bank. Subsequently the plaintiff bank released the bills of lading covering the two cars in suit, in compliance with the request of McKie & Tilton made in pursuance of the telegram from the grain company, solely for the purpose of storing, in order to prevent the ruin of the oats, and the grain company was never authorized to make any other disposition of the oats, unless the plaintiff was bound by the agreement of McKie in reference thereto. The evidence further showed that immediately after the grain company got possession of the two cars of oats it began to sell them, receiving 20 to 24 cents a bushel more than the amount of the original purchase-price. The bill of exceptions contains a large mass of evidence touching the grades and conditions of the oats in the other cars received by the defendant from McKie & Tilton, with a view of establishing the amount of the alleged counter-claim. On the question of the agency of McKie for the plaintiff bank the only evidence of a positive character throwing any light thereon is found in the evidence of Mr. Du Pree, an officer of the plaintiff bank, who testified as follows: "I have not at

any time, either directly or through any authorized agent, surrendered our claim of ownership over those two cars of oats covered by the bills of lading referred to. The suit being conducted in Atlanta, Georgia, about these two cars of oats, is being prosecuted with my knowledge and authority. The account of McKie & Tilton was credited in full upon the date the items were deposited in our bank. The telegram from the Southern Flour & Grain Company, under date of September 12, asking McKie & Tilton for the privilege of storing these cars, or rather the contents of the cars, was immediately brought to the bank by McKie & Tilton, and they requested that we grant the permission, which was done. It was not the purpose or intention of the bank, in the granting of their request, to give authority to them to sell it; these are new people to us. We knew nothing about them and we were simply seeking to assist our customers in coming to a common understanding with their client, and this was followed by Mr. McKie's visit to Atlanta, upon which occasion he hoped to do the same thing." Referring to the same subject Mr. Hoppe, the president of the defendant grain company, testified: that " Mr. McKie stated the purpose of his visit was to adjust the claims on the cars we had paid and on those that were unpaid, and the payment of the drafts held in the Third National Bank, including the drafts covering the cars sued on. . . He said that if we would pay the seven drafts we could hold the two cars turned over to us without pay to protect us against any loss or difference in grade of the seven cars unpaid. . . Mr. McKie did not tell me, while he was in Atlanta, at any time before we paid those seven drafts that these drafts and the two drafts covering the two cars sued for belonged to the Central Texas Exchange National Bank. . . He told me they were his and, as I stated in this answer, that we could hold them as a margin." Evidence was also introduced to show that demand for the payment of the drafts covering the two carloads of oats was made on the defendant grain company subsequently to the negotiations between McKie and the grain company and the refusal by the grain company either to pay the drafts drawn on it for the oats or to return the oats. At the conclusion of the evidence the judge directed a verdict for the plaintiff for the amount of the drafts.

*McElreath & Scott,* for plaintiff in error.

*Smith, Hammond & Smith,* contra.

HILL, J. (After stating the foregoing facts.)    1.   Under well-settled law and the repeated rulings of the Supreme Court, the undisputed evidence proved that the plaintiff bank held title to the two carloads of oats involved in the suit.   " Where a consignor of goods delivers them to a common carrier to be transported to a distant point, consigned to the order of the shipper, with direction to notify a designated person at the place of delivery, and a bill of lading is duly issued by the carrier to the consignor, and the latter attaches the bill of lading to his draft for the price of the goods on the person to be notified, and delivers it with the bill of lading, which is indorsed in blank, to his bank to be placed to his credit on his general account, and the amount of the deposit is credited to the depositor's general account and drawn against by him, the bank acquires title to the goods represented by the bill of lading." *Alexander* v. *First National Bank of Fresno,* 140 *Ga.* 266 (2) (78 S. E. 1071).   The undisputed evidence in this case places the plaintiff bank clearly within the principle of law here announced.   See also *National Bank of Webb City* v. *Everett,* 136 *Ga.* 372 (71 S. E. 660).   The plaintiff having proved title and conversion, refusal to deliver or to pay on demand, it was entitled to a verdict, unless the matters of defense set up caused such a conflict in the evidence as would require solution by a jury.

2.   It may be conceded that the defendant company proved, as claimed, that an agreement had been entered into between it and McKie, representing McKie & Tilton, from whom it had purchased, that it could keep the two carloads of oats as an indemnifying margin against off-grades of the oats contained in the other seven cars.   But it must be conceded also that this arrangement constituted no defense unless McKie was acting for, or on behalf of, the plaintiff bank.   And this is the claim of the defendant company.   But this mental attitude is not only not based on evidence relating to the subject of agency between McKie and the plaintiff bank, but the only evidence on the subject is directly and positively to the contrary.   The officer of the bank testified positively that the bank had never, directly or through any authorized agent, surrendered its claim of ownership over the two cars of oats covered by the bills of lading, and the only other witness on the subject is the president of the defendant company, who testified

that McKie had positively told him, when he was endeavoring to adjust the differences arising out of the off-grades of the oats, that they belonged to McKie & Tilton. This is the only evidence on the subject of agency between McKie, of McKie & Tilton, and the plaintiff bank, and, instead of tending to establish that relationship, this evidence expressly negatives it.

3. The defendant grain company insists that if the plaintiff bank did hold title to the two carloads of oats, it surrendered the title when they authorized the Third National Bank to deliver to the defendant the bills of lading covering the two cars, and that the circumstances were sufficient to authorize the inference that . the surrender was made for the purpose of enabling McKie, representing McKie & Tilton, to adjust the matters of difference between the defendant and McKie & Tilton, and that the arrangement which had thereupon been entered into by the defendant and by McKie was binding upon the plaintiff. This contention is not supported by the evidence. To determine whether or not the plaintiff had surrendered title to the two cars, we must consider the evidence which is not in conflict. This shows that the defendant company got possession of the cars as a bailee for the plaintiff bank and for the sole purpose of storing the cars to prevent the ruin of the oats. This was the purpose of the bailment, and, as far as the evidence discloses, the plaintiff bank relied solely on this fact. The purpose of this bailment was afterwards, without any authority whatever, changed by McKie, of McKie & Tilton, who authorized the grain company to hold the two cars as a margin for security for alleged claims against other cars already paid for. This, apparently, was a fraud perpetrated not by the bank, or with knowledge on the part of the bank that it was being perpetrated, but it was perpetrated by a third party without the slightest authority from the bank and after this party had sold to the bank the oats in question and to induce the grain company to pay the drafts for the other oats.

4. Learned counsel for the plaintiff in error, in their able and exhaustive brief, failing to establish any agency whatever between McKie & Tilton and the plaintiff bank that would authorize the inference that the bank intended to release its title to the two carloads of grain or change the temporary character of its bailment in any manner, insist that if neither the Texas bank nor

the grain company was guilty of fraud and both were in a legal sense innocent, the loss should fall on the Texas bank, on the principle that when one of two innocent persons must suffer by an act of a third person, he who put it in the power of the third person to inflict the injury must bear the loss. This is a sound principle of equity, but we do not think, under the evidence, that it can be invoked against the legal rights of the plaintiff bank. It may be conceded that the grain company was under the impression that McKie & Tilton were the owners of the oats in question, and therefore had a right to make any arrangement with reference to them, but the evidence is undisputed and irresistible that the plaintiff bank had the title to the oats in question and consented to their delivery to the grain company for the sole purpose of storage, and never at any time, either directly or through any authorized agent, surrendered this claim of ownership. We do not feel warranted in concluding that the defendant grain company obtained possession of the bank's property under false pretenses of a bailment with intent to appropriate the property to its own use. It is clearly shown that the act of the third person which might result in injury to one of two innocent persons was the act of McKie in untruthfully claiming to be the owner of the oats in question. The evidence clearly shows that the plaintiff bank as an innocent party would suffer great loss if the grain company, after getting possession of these oats under the pretense of storing them in order to save them from ruin, and at once beginning to sell them at a price from twenty to twenty-four cents a bushel greater than the original purchase-price, should be allowed to retain possession of this money to pay the alleged counter-claim of about $800 against McKie & Tilton. This would amount to an appropriation of the property of the bank that is wholly unwarranted by the facts, the law, or equitable principles.

5. In an action of trover the plaintiff has the option to demand a verdict either for damages alone, or for the property alone and its hire, if any. Civil Code (1910), § 5930. In the present case the plaintiff elected a money verdict for the highest proved value of the property. And the evidence from the grain company's books showed that it had sold all the oats in question for an amount exceeding the amount of the original drafts, which was the amount sued for in this case. The learned trial judge ruled

that the minimum of the plaintiff's recovery was the amount of the drafts, and for this amount the verdict was directed. A careful consideration of the evidence in the case convinces us that the verdict as directed by the court was demanded; and certainly the defendant cannot be heard to complain as to the amount of the verdict, as its own evidence proves that it has received from the sale of the oats not only a profit over the contract price, but a sum exceeding the amount of the drafts for which the verdict was directed.

*Judgment affirmed. Jenkins, P. J., and Stephens, J., concur.*